# IN THE COURT OF APPEALS OF IOWA

No. 24-1355
Filed December 17, 2025

IN RE THE MARRIAGE OF JASON C. JOHNSON
AND BAMBI A. JOHNSON

Upon the Petition of
JASON C. JOHNSON,
        Petitioner-Appellant,

And Concerning
BAMBI A. JOHNSON,
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Woodbury County, Roger L. Sailer,

Judge.


        A petitioner appeals the physical-care and spousal-support provisions of the

decree dissolving the parties' marriage. **AFFIRMED AS MODIFIED AND**

**REMANDED.**


        Brad Marsicek, Jackson Dziedzic, and William J. Hale of Goosman Law

Firm PLC, Sioux City, for appellant.

        Jacquelyn Johnson, Sioux City, for appellee.


        Considered without oral argument by Tabor, C.J., and Ahlers and

Langholz, JJ.

**LANGHOLZ, Judge.**

Jason and Bambi Johnson were married for roughly eleven years, and they share a daughter and a son. As their relationship broke down and neared its end, the Iowa Department of Health and Human Services began receiving a slew of child-abuse reports from both Jason and Bambi—ten reports in the period of about a year. All but two of the reports were unfounded and likely driven by the imminent or ongoing dissolution proceedings. And the two founded child-abuse assessments were both against Bambi—she tested positive for methamphetamine and engaged in conduct that was mentally damaging to their daughter. Still, the district court ultimately placed the children in Bambi's physical care and awarded her rehabilitative spousal support for twelve months.

Jason now appeals both the physical-care and spousal-support provisions of the decree. After carefully reviewing the record, we believe the children are best served in Jason's physical care. Although we agree with much of the district court's appraisal of Jason and recognize the difficult task of choosing between two imperfect options, we are troubled by Bambi's behavior leading up to the dissolution trial. Given her lack of accountability for methamphetamine use, her damaging behavior toward her daughter, her efforts to undermine the children's relationship with Jason, and the daughter's good progress while in Jason's physical care, we believe placement with Jason furthers the children's best interests. As for spousal support, we find the award equitable and reasonably tailored to enable Bambi to reenter the workforce and increase her earning capacity. We thus affirm the spousal-support award, modify physical care, and remand to establish Bambi's visitation and child-support obligation.

## I.      Factual Background and Proceedings

Jason and Bambi married in 2012, and each brought children from prior relationships.  In 2016, the couple welcomed a daughter, and three years later they welcomed a son.  The couple agreed Bambi would stay home to raise the children or pick up work on weekends while Jason worked as a trucker during the week.  In 2020, Jason took a higher paying trucking job that required him to travel more, and Bambi often cared for the children by herself during the week.

In 2022, as Jason and Bambi's relationship became strained, the Iowa Department of Health and Human Services ("HHS") began receiving reports.  For instance, the daughter reported to her therapist that Jason's son touched her inappropriately.  But upon investigation, the allegation was deemed unfounded, and the investigator believed the daughter "would change her story" and tell Bambi "what she thought [Bambi] wanted to hear."  Another time, HHS received a report that Jason inappropriately showered with and touched the daughter.  Again, the report was unfounded, as the daughter changed her account "multiple times" and appeared to be spurred by Bambi when responding to questions.  Yet another time, it was reported that Jason stopped giving the daughter her prescribed ADHD medication, believing that her behavior did not warrant it.  In response to the complaint, Jason agreed to speak with the daughter's medical providers about her ongoing need for the medication, and the complaint was closed as unfounded.

Of the ten reports received in the span of about a year, only two were founded—both against Bambi.  First, Bambi tested positive for methamphetamine in August 2023.  While Bambi had a history of using methamphetamine before her relationship with Jason, she disputed any current drug use and suggested her

Adderall use, or some nefarious conduct by Jason, caused the positive result. Second, HHS concluded that Bambi was causing the daughter "mental injury" by "parad[ing] [the daughter] around having her tell people about abuse," fabricating stories that the father was abusing the daughter, and ultimately harming the daughter's "sense of reality."

Meanwhile, Jason petitioned to dissolve the marriage in June 2023. In October, after the founded child-abuse assessment was issued against Bambi, the court placed the children in Jason's physical care and limited Bambi's visitation to two supervised visits per week. The case proceeded to trial in April 2024. Across three days, the court heard testimony from Bambi, Jason, the daughter's therapist, Bambi's mental-health provider, and many friends and family members.

In its eventual decree dissolving the marriage, the court placed the children in Bambi's physical care with liberal visitation for Jason. Acknowledging it was a close question, the court gave "particular weight" to Bambi's long history of being primary caregiver, Jason's pattern of "weaponizing" the dissolution proceedings against Bambi, and Bambi's remedial steps to address her mental-health and behavioral concerns. The court also awarded Bambi rehabilitative spousal support of $700 per month for twelve months. Jason appeals both provisions.[1]

---

[1] While this appeal has been pending, the district court entered a temporary custody order in February 2025—with the agreement of both parties—placing the children in Jason's physical care "pending conclusion of the appeal of this case or further order of the Court." They have remained in Jason's physical care since. While new evidence and arguments were made to the district court related to the temporary custody order, we do not consider any of those arguments or evidence here as we are limited to the record before the district court at the time of trial. *See Thomas v. Minner*, 340 N.W.2d 285, 286–87 (Iowa 1983) ("[W]hen an appellate court undertakes de novo review of a dissolution judgment and decree, it is basing its decision on the record made before the district court at the time of trial.").

## II.     Physical Care

Because dissolutions are actions in equity, we review the district court's physical-care-placement decision de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). Through that lens, we are empowered to adjudicate the issues anew following our review of the record. *Id.* Of course, we are mindful of the district court's preferred fact-finding position, particularly on matters of credibility. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984). But its findings do not bind us, and we must modify decrees as necessary to achieve equity or best serve the children. *McDermott*, 827 N.W.2d at 676.

"When considering the issue of physical care, the child's best interest is the overriding consideration." *In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007). To that end, "[w]e are guided by the factors set forth in Iowa Code section 598.41(3) as well as those identified in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974)." *Id.* Our goal "is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). And "[p]hysical care issues are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*." *Id.*

Jason urges that the court erred by awarding physical care of the children to Bambi. He believes that he would better support the children's relationship with the other parent, had greater success managing the children's behaviors at home, and is ultimately the safer and more consistent parent. We agree.

First, Bambi tested positive for methamphetamine and has not taken any accountability. At the time of the test, Bambi deflected responsibility by blaming

her Adderall use and even suggested Jason could have intentionally exposed her to it. Yet her explanation was not plausible—Adderall would not cause a positive result for methamphetamine. And without that accountability—particularly given her history of prior use—we struggle to conclude, as the district court did, that she is meaningfully engaging with all necessary services to enable her to safely care for the children.

Second, the evidence shows Jason is better equipped to support the children's behavioral and emotional needs. We are deeply troubled by HHS's finding that Bambi's behavior "was exacerbating [the daughter's] diagnosis and causing her to lose sense of reality." As part of its report, HHS observed Bambi prompt the daughter to allege abuse and, during those reports, the daughter would use words that "were not normal word choices" for her. During other reports, the daughter's demeanor would not match the emotional nature of what she was recounting or she would change the story. The daughter also told her guidance counselor that she and Bambi had "a plan" to keep her with Bambi and not visit Jason. Once the daughter was placed in Jason's physical care, however, the reports of abuse stopped. And the daughter's therapist testified to seeing improvements in the daughter, noting she appeared "a lot calmer and relaxed," was less distracted, could focus more easily, and seemed "really, really happy."

Third, and relatedly, Bambi has undermined the children's relationship with Jason, particularly between him and the daughter. Beyond Bambi's behavior during the HHS investigations, when Bambi began dating someone new, she did not discourage the daughter from referring to Jason as "old dad" and Bambi's boyfriend as "new dad."

To be sure, Jason has not always conducted himself well. Of particular concern is Bambi's testimony regarding past violence, his failure to ensure phone calls with Bambi while the children are with him, and his decision to stop the daughter's medication regimen without first consulting her healthcare providers. But when choosing between two imperfect parents, we believe Bambi's misconduct tips the balance in favor of Jason having physical care of the children.

In reaching this decision, we do not discount Bambi's historical role as the children's caregiver. Yet "[w]e do not award custody based on hours of service for past care. We attempt to look to determine which parent will in the future provide an environment where the child is most likely to thrive." *In re Marriage of Engler*, 503 N.W.2d 623, 625 (Iowa Ct. App 1993); *see also In re Marriage of Wilson*, 532 N.W.2d 493, 495 (Iowa Ct. App. 1995) ("The parent who has been the primary caretaker of the children during the marriage will not necessarily be designated the primary caretaker at the time of a divorce."). Both children did well in Jason's care between the court's October 2023 temporary custody order and the April 2024 dissolution trial. And we place particular weight on the testimony of the daughter's therapist, who has observed meaningful improvements since the change in care.

Ultimately, our de novo review of the record leads us to depart from the district court. In so doing, we acknowledge its tremendous efforts in combing through the large record here and issuing a thoughtful and thorough decree. Still, we believe Bambi's lack of accountability for testing positive for methamphetamine, her harmful behavior with the daughter, and her concerted effort to undermine the children's relationship with Jason counsel against Bambi having physical care of the children. Thus, we modify the decree's physical-care provision to place the

children in Jason's physical care. And we remand to the district court to determine Bambi's visitation and child-support obligation.[2]

### III. Spousal Support

Jason next argues the court erred by awarding Bambi $700 per month of rehabilitative spousal support for twelve months. Neither party to a marriage has "an absolute right" to spousal support. *In re Marriage of Mills*, 983 N.W.2d 61, 67 (Iowa 2022). But courts may award spousal support depending "on the particular facts and circumstances of each case." *In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022). When setting an equitable spousal support award, we are guided by the statutory factors in Iowa Code section 598.21A(1) (2024), and our caselaw "ordinarily places some degree of emphasis on the duration of the marriage and the earning capacities of the spouses." *In re Marriage of Mauer*, 874 N.W.2d 103, 107 (Iowa 2016). As with physical care, we review spousal-support awards de novo and will only intervene when necessary to achieve equity. *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023). And we are mindful of our supreme court's admonition to refrain from "undue tinkering" with spousal-support awards on appeal. *Id.*

Rehabilitative spousal support seeks to support "an economically dependent spouse through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting." *Id.* at 185–86 (cleaned up). Consistent with its goal of self-sufficiency,

---

[2] Jason also appealed the provision of the dissolution decree regarding his visitation with the children. Because we are awarding him primary physical care, we need not address the visitation issue.

"the duration" of rehabilitative spousal support "may be limited or extended depending on the realistic needs of the economically dependent spouse, tempered by the goal of facilitating the economic independence of the ex-spouses." *Id.* at 186 (cleaned up).

Here, Jason argues the district court miscalculated his income, Bambi was not an "economically dependent" spouse, and that no spousal support is warranted. But on our review, we find the rehabilitative award equitable. Jason left a position in Omaha to care for the children after the October 2023 temporary-custody order. That position paid roughly $58,000 per year. He testified that the job would "still be there for" him when he returns, and that he indeed intended to return and resume the position. Bambi, in turn, left the workforce for several years to raise the children. At the time of trial she was enrolled in a program to obtain her GED and working part-time at Pizza Hut. After reviewing Bambi's paystubs, the district court estimated she took home roughly $26,000 annually.

Based on this evidence, we agree with the district court that Jason was "capable of maintaining full-time employment at a much higher rate of return than is Bambi," and that Bambi, while "presently limited in her ability to work," had "already begun taking steps to improve her employment prospects." Thus, the facts here fall competently within the goals of rehabilitative spousal support. And accepting Jason's higher income capacity, we find the amount of $700 per month, for the limited duration of twelve months, both economically viable and equitably tailored to help Bambi return to the workforce and increase her earning capacity.

### IV.     Appellate Attorney Fees

Finally, both Jason and Bambi ask for an award of appellate attorney fees. We have discretion whether to award appellate attorney fees in an appeal of a dissolution decree. *See McDermott*, 827 N.W.2d at 687.   In exercising that discretion, "we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."   *Id.* (cleaned up). Considering these factors, particularly the fact that Jason and Bambi each prevailed on an issue on appeal, we elect to deny both requests for appellate attorney fees.

**AFFIRMED AS MODIFIED AND REMANDED**.